No. 15-3173, Federal Education Association v. Defense. Ms. Lee. Hi, my name is Dorothy Lee and I'm here representing both the FIRED employee, Karen Gravis, and the Federal Sector Employment Union, the Federal Education Association. We believe that Karen Gravis was found guilty of an egregious due process violation done on the part by Dr. Frank Calvano, superintendent, at the school system where she was employed. And in the decision process, we believe that the penalty that was selected for her was unreasonable and violated the Douglas factors. With regard to Dr. Calvis' role, the mediator, I'm sorry, the arbitrator, examined that at some length, didn't he? Yes, he did. And he assessed the question and he concluded that that email, even if it preceded the events that we're here to discuss, he concluded that on balance, there was no evidence that the by that. Is it your position that A, he couldn't make that decision, or B, that decision is simply wrong? Both. Is there such a finding? I didn't, maybe I'm mistaken. No, the only finding that I found is that he, the only finding that I believe he made was that he thought that Calvano was truthful. No, he made a finding that he thought Calvano, well, that Kuykendall was independent. Yes. Yes. Yes. That's what we're. Yes, and that's the question. I take that as a decision that Kuykendall was not influenced by, he was independent. Yes. What could independent mean other than whatever Calvano had to say wasn't important to him, or at least it didn't determine anything. Correct, and that's what we think is at issue here for the due process violation, because in Stone and Caperton, the question is, first of all, it's important to remember that Dr. Calvano's email where he directed his two subordinates, who happened to be the proposing and deciding official, he directed them and stated, not a suggestion, he said we need to terminate this person. Can I just ask this one factual question? I don't understand exactly what the email is saying. He said, Calvano says, I think this is going to come back with a ruling of no foul. A ruling by whom? The Family Advocacy Program people. In our schools, in the Department of Defense dependent school system, what happens is when there is an allegation of any kind of abuse or inappropriate touching of students, it goes to Family Advocacy for an independent investigation. And then they interview people, they look at the situation, and then they come back with an assessment, and he was casually saying, they're not going to find anything. What's the significance of the assessment that they make, the Family Advocacy or whatever it's called? Well, it's required by the school system's own procedures. Yeah, but what happens if they make a determination of no foul? What happens? What's the significance of that? They send that to the school system, and then the school system can use it, if they wish, to decide whether or not to discipline the person or to let it go. Well, now, at the point where that email was issued by him, were there charges against her at that point? No. No. No. So what is it that, what is he, is there some investigation independent of the petitioner in this case? The Family Advocacy Program, we just call it FAP for short, they do an investigation of whether or not there's, in essence, they call it institutional child abuse. And I think Dr. Cavanaugh was stating that he didn't think it was institutional child saying, hey, I don't think they're going to find anything, but I want her fined. What had triggered their investigation? Anything in particular, or this was just a periodic investigation? No. No. Anytime we have a, again, these are agency regulations that basically say, if you, any employee, sees something that may be considered child abuse, you don't have to come to the questionable, you report it to FAP. What had they seen? That was... Did it relate to Ms. Gravis? Yes, it was Ms. Gravis's... It was the earlier events that had caused the initial, the earlier letter of reprimand, is that what we're referring to? No, this... It was the principal's report, correct, that triggered the FAP inquiry? Well, what happened was one of the aides told the principal, and the principal is required to report it to FAP. And that's what started the FAP inquiry? Yes. Okay. I have this question. To me, this is very central. This email that we're looking at, and then the email that the principal replied in return, where it says, we have two witnesses, I strongly support termination. Those occurred before the arbitration, but after the hearing that was given to the employee. Before the termination, you mean? Yeah. When did she receive these emails? Was it after the hearing on the termination, or was it... And before the arbitration? We did not get the email or the statements at the time where discipline was proposed. We did not have them at the time that we gave our oral and written response. We did not get copies of those things until the arbitration hearing, when discovery was done. So at the point where it proceeded to arbitration, the decision to fire, what you're arbitrating is a decision of fire? Correct. And does this process afford the employee to respond to, for example, had she known of these emails prior to the arbitration? Is there a procedure or process where she could have replied to these emails or addressed them? Oh, absolutely. We would have immediately requested that Dr. Calvano recuse himself and Mr. Kirkendall, Todd Kirkendall, that they recuse themselves as deciding officials because they're tainted by that email. Right. Okay, so when you say we were denied due process, you're not talking about the arbitration. You're talking about the process before arbitration. Absolutely. And the emails came in in between those two processes. Well, the email from Dr. Calvano preceded any decision. I mean, you weren't made aware of the email. Correct. That's what I'm talking about. That is exactly what we are. That's what our argument is exactly. Well, that's not all your argument is. No. I mean, even if they disclosed it to you, you would be saying there's a due process violation because this exerted undue influence on the decision maker at the time he made the decision to terminate. Correct. I was only referring to the timeliness in the argument. The timeliness of this email, that it occurred at the very start and, in our opinion, it tainted everything that followed after that, and we were not provided with a copy of it until the arbitration. Therefore, we were prevented first from knowing about it, from making any arguments regarding it, from asking for our response to go to someone not under the supervision of Dr. Calvano. We were denied all of these things. So you weren't able to respond whether, for example, the district superintendent has undue influence over the principal. Correct. We could not respond to any of that. We were rather blindsided. We got this at the end, I mean right before the arbitration, dealt with it the best we could, and we think the arbitrator was simply wrong in deciding that Dr. Kirkendall, he believed him to be trustworthy in his assessment that he wasn't influenced. The arbitrator made a point, and I'd like to know how you feel about it. The arbitrator made a point that the e-mail from Calvano's mentioned two possible grounds, none of which were involved in the actual discipline decision, and the arbitrator took that as some evidence, I guess, that Kirkendall, it's not as if Calvano's had prejudged the actual issues that were before Kirkendall. That's the way the arbitrator looked at it. How do you view that? Well, I view that in exactly the opposite. I think when Dr. Calvano came, when Dr. Calvano wrote his e-mail, he said, I want her fired, and he put forth two, he put forth what he wanted her fired for that would have, these were far more serious, two incidents of insubordination and physically harming a student, would have been more likely to produce the result he wanted, which was removal. Now, the actual letters, the actual notice of proposed removal, comes out of a separate office at Peachtree City, and yes, it did allege a lesser charge of inappropriate contact with a student, but I don't think that that had any effect on what was going on at Campbell. At Fort Campbell, with the proposing and deciding official, they were marching to Calvano's orders that she will be removed, and she will be removed for two counts of insubordination and one count of bodily harm to a student. But that isn't what happened. Well, she was still removed, which was the end result, and the punishment selected for her removal was consistent with the charges that Dr. Calvano said in his e-mail that he wanted. But ultimately, the removal was not based on corporal punishment and insubordination, or as the principal had suggested, that we could find the offense of insubordination causing bodily harm. Causing bodily harm and corporal punishment were not ultimately the basis for removal. Correct. The basis for removal was the inappropriate physical contact, correct? Is that actually a DODA charge that's recognized? That is not in their penalty. That's not in their penalties. So how did the arbitrator determine that? If it's not in the penalty and it's not a charge that can be brought, a formal charge, then how do they determine whether the punishment is appropriate to that charge? I believe what the arbitrator said in that is that the agency has discretion to choose a penalty that they feel is consistent with what they're charging. But you're not arguing on appeal that the table doesn't support the penalty for this charge, right? I'm sorry? You're not arguing on appeal that the charge doesn't support a penalty of termination, right? No. What we're arguing is that what the arbitrator did was misapply the Douglas factors. He did not consider, not the arbitrator, the agency misapplied the Douglas factors. They did not consider mediation, I mean mitigation, I'm sorry, and they considered as irrelevant things that were important. Let's get to it. Go ahead. You address a lot of the merits where you're dealing with the arbitration, but isn't your case really that you never had the opportunity prior to the arbitration to deal with these issues, to actually address them at the process that's prior to the arbitration? Absolutely. And that's the due process you're talking about? Correct. Yes. No, it's not. That's not the whole argument, as I understand it. The argument is that even if it had been revealed to you, it would still be improper to have Mr. Kirkendall be the deciding official when he'd received this email, no? Correct. I'm not sure that I personally understand the difference in the two that you're saying, because we do believe it's a due process issue. Well, the difference is there are two things going on here. One is that your client did not receive this email or knowledge of this email before the decision to terminate was made. You didn't receive it until the arbitration. That's argument number one. Argument number two is even if you had received the email before the termination, it was still inappropriate for Kirkendall to be the deciding official when he had received this email from Calvano. Correct? Correct. Correct. Who would be the deciding official in that case? Well, what we have done in other cases is when we do our response, and again, had we known about the email in the response, we would have asked that he recuse himself and have someone else be the deciding official, and that would have been a decision made by people above Dr. Calvano. It would have to be somebody from outside the system, because everybody in the system knew of Calvano's email, wouldn't it? Yes. It would have had to have been someone outside of the Kentucky School District, definitely. Let me ask you something about the merits. Can we get a little bit on the merits of the case? Sure. Let me put my question in a kind of personal context. When I was a little boy misbehaving in school, it was not uncommon for teachers to have a ruler and give you a little rap, and that was life back then. But when my children were in school at this age, or none of whom happened to be disabled, so I don't have that experience, but by that time teachers were not allowed, if you will, to physically engage with the students. You couldn't rap them across the knuckles. You could take them down or lead them down to the principal's office, but you weren't allowed to physically discipline them. Parents had to do that. I'm a little puzzled as to exactly what the environment of your school must have been with these disabled children. In this particular case, one child having tantrums and so on. Was it customary or was it understood that in some cases an experienced teacher would have to physically touch the child? Was that never permitted, sometimes permitted, always permitted? How did that work in practice? Generally they discourage touching children in general, but in a special education classroom, which this was, and it had non-verbally communicative students who can't handle their emotions, yes, they are allowed to touch the students. In fact, in many cases they diaper the students. They feed the students. They touch them in various ways. Could they make the student have a time out, which was a favorite activity for my children. They would get time out. Could they require these children to have time outs? Yes, they could. And if the child didn't want to participate in that, what were they to do? Well, in this particular case she had tried time out and it had been unsuccessful. And this is where the situation here, the merits of the case, restraining is permitted in special education classrooms outside of DDes. But here in DDes they only want you to restrain the child in the event that they could hurt themselves or hurt others. So what she's accused of, or what she did that they did not like, was she attempted to restrain the child to get the child to calm down. And one of the two restraints that she did is in their CPI handbook about what a permissible way. She apparently had a history of that because sometime before this particular event she had been given a letter of reprimand for having physically restrained a child previously. Apparently there were some incidents even before that. Is that correct? Yes. They had a new principal who had come from California who had a way of handling special education children that was not the norm at Knox. So there was basically an adjustment period where someone who came in from California had one idea of how these students should be handled and the norm that had been going on was slightly different. And what her letter of reprimand was for was simply helping two teachers carry a student, a regular education student, who was not willing to go to the principal's office and throw in a temper tantrum and they simply carried that child to the office. The problem with that kind of a situation is you have to ask yourself, well what do you do if the child won't go to the principal's office because everybody is responsible for other kids. They can't just leave the child there throwing the temper tantrum. So you're sort of between a rock and a hard place and they chose to carry the child to the principal's office where he would be safe and that was not allowed. She must have had a history of not conforming to the local norm. Is that what we're talking about? No, no. Her first year as a special ed teacher she worked for Dr. Mallon and he gave her a glowing performance evaluation. Well she just disagreed with her new supervisor on how this should be handled and the allegation and the finding is that she didn't accommodate herself to the new rules and that's basically it. On top of which she appears not to have been candid about her testimony to the arbitrator as to what actually happened. Well what is, yes she did butt heads with the new principal but she was trying to comply with the new principal and on the day which was March 22nd when Dorian was having a meltdown all day long she was complying with the wills of the principal. She was trying, she didn't know what else to do. She called for the principal to come down and help her, show me how you want it done, come and teach me what you want and even sent someone down to retrieve the principal but the principal never came which left her with the child and no guidance on what the principal would approve. You've got some findings of the arbitrator here to the contrary on this stuff and you haven't said they're unsupported by substantial evidence so for purposes of this we have to accept them. We're way over our time so we'll give you two minutes. Can I ask just one question? This goes to one of the incidences of inappropriate touching. The record shows that the child is involved in an exercise I guess of putting objects in boxes and just for purposes of clarity for my question getting a blue object or a star and putting it in this box and the principal came in and the teacher had her hand, the child it looks like was putting the object in the wrong box and the principal put, I mean the teacher put her hand on the child and directed him to the appropriate box and that was deemed to have been an inappropriate touching. By the new principal, Dr. McClain but not by the former principal whom she had the year before by Dr. Mallon. It is with special needs children sometimes they do need assistance if they aren't verbal. Sometimes you have to take their hand and show them what you want them to do. Show them that you're putting the blue bear in the bowl with the blue bears. You have to show them. And the only way to show them is to take their hand and move it. But you are correct. That was something that Dr. McClain objected to. One last question. What is it exactly that you're seeking? What's the relief? If we were to find in your favor, what would happen? Well, we would like to have the arbitrator's decision reversed. But that gets her job back? Yes. And back pay? Yes. Yes. Does she lose her retirement benefits and all that as a result of this? I could not. She would not. My understanding, and I will say up front I could be wrong on this, that she would retain her credit towards retirement that she had earned. But whether or not she's ever qualified to receive her retirement, I don't know. Okay, thanks. Okay, thank you. We'll give you two minutes for rebuttal. Thank you. Ms. Hogan. Thank you. Good morning, Your Honors. May it please the Court. Let me tell you what the problem as I see it for you is. Okay. I mean, in Supreme Court's decision in Loudermill, it says there has to be pre-deprivation, that is pre-termination due process. Our Stone decision set forth some of the factors, page 1377 of that decision. And those factors seem to be applicable here. And I'm wondering whether you agree with that. As I said, it's merely cumulative information. Well, the email is not cumulative information. And whether the employee knew of the error and had a chance to respond, no. That didn't happen before the termination. And three, whether the ex parte communication was of a type likely to result in undue pressure. And you would think that a supervisor's statement to his subordinate that we have to terminate this person would fall into that category. Do you disagree with that assessment? I disagree for two reasons. First, the Stone Ward line of cases and what we require of pre-termination due process, constitutional due process, this Court has been concerned with ex parte communications with a deciding official. Ex parte means, to me, there has to be a proceeding going on. And so communications between supervisors before any discipline is proposed does not meet the definition of an ex parte communication. It's not the same as the facts in the Ward or Stone. The way is that there's already the, everything that we're dealing with today seems to me to have been in process when the superintendent wrote the email because he's referring to that process. And that was our first questions that we had. It turns out that there's a FAP inquiry underway, and that FAP inquiry is set off by the principal's report that deals with all the incidents that we're talking about. So why would, okay. Yes, thank you, Your Honor. So we have the situation on March 22nd. We have these two incidents where Ms. Gravis has inappropriate physical contact with this child. The principal is made aware of these incidents, and the principal is required to submit this report, a child abuse, essentially a child abuse report to the family. Does the employee get a copy of that report? Or is aware of it? I'm not sure the answer to that question, Your Honor. But that is a completely separate, non-disciplinary process. Well, not really because right there in reference to that report, the superintendent says, fire her. So what happens, and the court can see this is page 630, the email. The principal submits the report, as she's required to, and appropriately, I believe, sends a copy to her supervisor saying, this has happened in my school. I'm making you aware of it. I don't think there's anything wrong with that. And as one might imagine, the superintendent is upset about this. There's been very serious accusations about a child in their school, and there's sort of an immediate off-the-cuff stance. But now he's going to hear. He's surprised. If there's serious allegations, the FAP inquiry, he thinks, is going to come back with, okay, I mean, no foul. Correct. Then he goes on and says, irregardless of that, we, meaning me and you, you principal, me superintendent, we need to try to terminate her for corporal punishment and insubordination. So at that point in the proceeding, he's already made the decision. The superintendent has made the decision, let's fire her, and let's fire her for these reasons, corporal punishment and insubordination. So my question to you is, at what point prior to the arbitration did the teacher have the opportunity to address the charges that are being levied against her dealing with corporal punishment and insubordination? There were never any charges against her for those two. Those two charges were never levied against her. So there was no, I mean. Well, they weren't levied against her because I guess they were not supportable, but those were the reasons why she, at this point, the initial decision to fire her was based on these reasons. And right now, I guess my question doesn't have to deal so much whether these were actual accurate charges under the DOA, DA regs, but rather whether the employee ever had the opportunity to say, look, the reason you chose to fire me was for corporal punishment. She never had the opportunity to challenge that. She was able to make that argument at arbitration. Yeah, but the problem is the due process protection applies to the termination proceedings. Let me bring you back to the stone factors. You say one reason these factors are inapplicable here is because you think the proceeding hadn't started yet when the email was sent. Okay, what are the other reasons that these stone factors are inapplicable? The reason is that this just is not new and material evidence. When we compare this to, for example, ward, where the evidence that the deciding official received during the time that the deciding official was making this decision was information about prior discipline that was not identified in the notice of proposed removal and that the deciding official specifically took into consideration and the employee never had the opportunity to address whether that was. Okay, so that sounds very much like the first argument. What other arguments do you have as to why these stone factors are inapplicable? I think those are my two reasons for why those are inapplicable. I think that also the arbitrator found that when the arbitrator looked at these factors, was not convinced that this was a violation along the stone ward lines. I mean, for example, the undue pressure issue. You didn't discuss the stone factors, right? So, for example, the third factor, whether the communications were of the type likely to result in undue pressure, the arbitrator heard very specific testimony that Mr. Kirkendall... No, he didn't hear testimony about whether it was likely to cause undue pressure. What he heard was testimony that it did not, in this instance, cause undue pressure. So, and the stone test is not whether, in fact, the person acted as a result of undue pressure. The stone factor is it's likely to cause undue pressure. Surely, receiving this kind of email from your supervisor is likely to cause undue pressure, isn't it? No, I disagree. Again, for two reasons. First, if we look at the chronology, we have these two incidents involving the child that occur. Immediately, the report is filed, and the supervisors are made aware, and there is, you know, we acknowledge an email that probably should not have been sent by Dr. Calvano, off the cuff, you know, obviously upset about this. And then two weeks go by before the proposing official, in coordination with the Labor Management Branch, files the proposed... You get all the pressure you want as long as the notice of proposed removal hasn't yet been sent. That seems to me a very hard argument to make. Well, I also think that why it was appropriate for, you know, and again, the Caperton case that petitioners cite to, the Supreme Court says we have to look at the facts and the circumstances. And the facts and the circumstances here are that Dr. Calvano and Mr. Kirkendall had worked together for 10 years. They often disagreed about what appropriate conduct was. Let me direct your attention to, again, to the two emails. So the district superintendent says we need to, and he's talking to the principal, we need to try to terminate her. The principal replies and says, I strongly support termination. It seems to me that that shows that the principal is agreeing with the district superintendent. I strongly, she's not, the principal's not saying, you know, I believe termination is proper, I'm going to terminate her. He's replying directly to the district superintendent saying, I strongly support termination. I mean, that on its face shows influence. In fact, the principal made the decision to terminate her at the suggestion of the superintendent. I don't believe that's what the facts actually show. If we focus only on this email. I just read you what the emails say. Right. And, again, if you focus only on this email, that doesn't create the whole story. And we have what actually happened, the notice that was actually given, the opportunity to respond that was actually provided, the decision to remove her for inappropriate physical contact with the child that was actually made, and then we have testimony received by the arbitrator and the arbitrator's determination that these facts were supported and that Dr. McClain had serious concerns about her in light of continued, I mean, the fact that. It seems to me what you're really arguing, put aside the order of the transactions here, what you're really arguing is that where there is testimony that the deciding official is not influenced and the arbitrator makes a finding that he acted independently, that that eliminates the due process problem. I think that's the heart of your argument. But I'm not sure that that is a defense because Stone says that there's no harmless error defense here. How do you square that with that statement? I think to what Stone says is that if there's been a due process violation, it can't be cured by harmless error analysis. If the court were to find that this is a due process violation, this is going far beyond what this court has ever said in Stone or Ward, and I would contend what the constitutional minimum is required. I suppose you could add in response that the purpose behind the no influence rule is you don't want inferior officers ginning up excuses for carrying out the superior's desire to get rid of what the superior thinks may be a problem person. And so the question then arises, is there any evidence to suggest that this disciplinary occasion was ginned up? That is, what is the evidence to support the fact that these events actually occurred? And if they did occur, what is the evidence to suggest that the penalty in this case is unreasonable or not usual in this kind of a situation? The concern with influence is that people then create facts or circumstances that essentially trap the individual. You could make the argument that the evidence here in the testimony of the eyewitnesses, including the two junior assistants, was certainly not influenced in any way by Calvinus or even Kirkendall for that matter, so that this was clearly an independent event. And the question then is, is the penalty appropriate? Why is the penalty appropriate here? Why should she have been fired instead of given some sort of additional training or opportunity to correct herself? The penalty was appropriate because she did have prior discipline on the specific conduct. She had recently received training about when it's appropriate to physically restrain a child, and it was very serious conduct, conduct that could have injured the child, conduct that could have opened the school district to litigation, conduct that no parent would have been happy to hear about. And it was clear that the principal's guidance and the guidance of Mr. Labriola, the specialist who focuses on this kind of training, hadn't helped. So there was no sense that rehabilitation was going to be possible. And the fact that this particular charge isn't in the table of penalties doesn't matter. The agency is not limited to the table of penalties. They can look to the table of penalties for guidance, but the charge was inappropriate physical contact with a child. There were two specifications, and Ms. Gravis was notified of that. She had the opportunity to respond to that. She'd been in the system a long time and was a very experienced teacher. Well, she'd actually only been a teacher for about two years. She'd had significant previous experience working with special needs children in a more institutional environment, but she'd actually been a fairly recent teacher. A recent acquisition to this organization. Yes. Let me bring you back to the due process thing. Let's suppose in the course of a court litigation, a litigant sends an email to one of the judges and says, this case is really important to me. It's really important that you, in this case, affirm the termination. And the judge doesn't disclose that. It's totally improper, right? And there'd have to be a recusal, and it would be reversible error. It would be inappropriate for probably two reasons. One, proceedings have actually been going on, and two, I assume there's probably some judicial ethics requirements. But I think that's a slightly different case. But that would require recusal under that hypothetical, right? Yes. And it wouldn't make any difference that the email had been sent before the appeal was taken. As long as the email says you're about to get an appeal and you've got to be sympathetic to us and affirm the termination. That would be improper, right? That would be improper. And it would require reversal of the decision, right? I'm not sure. In all likelihood, it would. Then let me ask you this question, just following up on Judge Dyke's hypothetical. Suppose that the email is never disclosed and we proceed with the hearing and the appellant or whoever is unaware that the email came in and the hearings are over, the hearing is held against her. Wouldn't you say that she was deprived of due process by not being told about the communication? No. Again, I do not believe that the Constitution required that this email ever be disclosed to her because it was not a piece of evidence relied upon by the deciding official. But in my hypothetical about the court situation, it wouldn't make any difference whether the email was relied on in reaching the decision. The very fact that it was sent is enough to make it an improper proceeding and require reversal, correct? Yes. I think the distinction would, and again, I think we have to look sort of real life here. The distinction is that the relationship between a litigant and the court is a very different relationship than supervisors' management. It is a very different relationship. The supervisor has more influence over the deciding official in this case than in my hypothetical about the litigant and the court. Potentially. Although, again, I think the evidence here demonstrated that there was no influence. Did the government consider, once this email was revealed, did the government consider sending it back for rehearing with a different decision maker? I don't believe that was considered. Just as a point of timeline here, the email, again, the email was not disclosed prior to the removal. The email was obtained under federal labor laws. The union may ask for documents just as a matter of course. Some four years after the removal, right before the arbitration began, there was a request for documents, and this was one of the documents that was produced. Quite frankly, I think most of the officials had kind of forgotten that it even existed. Let me ask the question a little bit differently. In response to a question from the court, your colleague said that if we reverse the arbitrator, she gets her job back and back pay and everything else. Could she be, this is not a criminal case, so there's no double jeopardy, could she be recharged with a different decision maker on the same charges if that's what the government chose to do? Absolutely. Yeah, there would be nothing to stop the agency from beginning a new procedure anew on the same facts. Okay, thank you. Anything further? Okay, thank you, Ms. Hogan. Thank you, Your Honor. Unless you have any questions, I have nothing else to add. Okay. If there are no questions, Ms. Lee, Ms. Hogan, thank you very much. The case is submitted.